## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHIRLEY ZALENSKI,** | : | **Civil No. 3:15-CV-2428** |
| | : | |
| **Plaintiff** | : | **(Judge Mariani)** |
| | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **WILKES-BARRE HOSPITAL** | : | |
| **COMPANY, LLC d/b/a** | : | |
| **WILKES-BARRE GENERAL** | : | |
| **HOSPITAL,** | : | |
| | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

## I.      INTRODUCTION

This action presents an employment dispute between Shirley Zalenski and her former employer, Wilkes-Barre General Hospital. Zalenski was employed by the Hospital as a Licensed Practical Nurse from 1986 until May 8, 2014, when her employment was terminated. The Hospital maintains that it terminated Zalenski after a work history marked by an extraordinarily high number of work place violations and pattern of deficient conduct, which was capped off on April 29, 2014, when she violated the Hospital's patient identification protocol, which was an issue about which she had previously and repeatedly been warned. For her part,

Zalenski claims that the decision to fire her constituted unlawful discrimination based upon certain medical or mental-health challenges that she had, and that the reasons given for her firing were pretextual. Zalenski alleges that the Hospital violated the Family Medical Leave Act and the Americans with Disabilities Act, both by discriminating against her and by retaliating against her for engaging in protected activity.[1]

The Hospital has moved for summary judgment and the motion has been referred to the undersigned for preparation of a report and recommendation. For the following reasons, it will be recommended that the motion be granted.[2]

---

[1] In Count IV, the plaintiff alleges claims for violations of the Pennsylvania Human Relations Act which largely parallel the protections of the ADA. In the past, courts have construed ADA and PHRA claims simultaneously because the statutes were essentially identical in their scope. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002). In 2009, Congress relaxed the ADA's standards for disability claims, but the Pennsylvania legislature has not similarly amended the PHRA. *Szarawara v. Cnty. of Montgomery*, Civ. A. No. 12-5714, 2013 U.S. Dist. LEXIS 90386, 2013 WL 3230691, at *2 (E.D. Pa. June 27, 2013). Although the legal standards under the statutes may now be somewhat different, any differences are immaterial to the analysis of the claims in this case, and, therefore,+ the claims will be analyzed together.

[2] The plaintiff's claims, moreover, are somewhat difficult to isolate in this action, and her theories seem somewhat to have evolved or shifted between the filing of the amended complaint and the completion of discovery, and even the briefing on the defendant's motion. It appears that Zalenski is claiming that she was fired because the Hospital believed that should need to be out of work for an extended period to convalesce from surgeries, or because she sought permission to wear a brace on her wrist and thumb, or even because she was a highly-paid employee. In the amended complaint, the plaintiff averred that she was discriminated against on the basis of her depression, but this issue was apparently not pursued in discovery, and the plaintiff instead focused on her claim that the Hospital refused to

## II.  BACKGROUND

The defendant in this action, Wilkes-Barre General Hospital, is a 411-bed acute-care facility situated in Wilkes-Barre, Pennsylvania.  The plaintiff, Shirley Zalenski, was hired at the hospital in 1986 as a Licensed Practical Nurse. Beginning in 2002, Zalenski worked on a unit of the Hospital known as 6 East. Her duties included making hourly rounds, administering medications and other treatments, and assisting physicians.  (Doc. 26, Def. SUMF, Ex. C, Deposition of Shirley Zalenski ("Zalenski Dep.") at 92:4-16.)  Ms. Zalenski was supervised at all relevant times by Clinical Director, Kathleen Pisano, and Clinical Leader, Patricia Kipp.  (Id. at 86:22-87:6 and 106:17-24.)  It is undisputed that all LPNs at the Hospital are required to abide by the Hospital's policies, including documenting all interactions with patients.  (Id. at 100:1014.)  The hospital maintains a written progressive discipline policy, which provides for four tiers of violation categories, and any combination of so-called Group II and Group III violations warrants termination.  (Doc. 26, Ex. E, Declaration of Lisa Goble ("Goble Decl.") ¶¶ 4-6.)

By any measure, the plaintiff's lengthy tenure with the Hospital was marked by a checkered employment history stemming largely from multiple violations of Hospital policy, including numerous instances in which she failed to document

---

accommodate her request to wear a wrist brace and because the plaintiff believes that the Hospital suspected that she would need to be out for an extended period for neck surgery.  As will be discussed, however, the evidence fails to bear this out.

patient interaction. Indeed, the evidence is undisputed that during her employment, Ms. Zalenski amassed 35 notices and other written documentation for poor performance during her employment. (Doc. 26, Ex. F, Decl. of Kathleen Pisano ("Pisano Decl.") at ¶ 3, Exs. 2-4.) Among the write-ups were "Notices for poor performance," which was a tool that the Hospital used to document poor employee performance without triggering the Hospital's formal progressive discipline policy. This history of receiving notices for poor performance extended over a course of years, and included write-ups for violations such as: failing to clamp IVs to infuse medication properly; failing to change IV sites on patients; failing to mark narcotic counts as completed; and failing to set a bed alarm for a patient deemed a high fall risk. (Pisano Decl., Ex. 2.) According to Ms. Pisano, the Clinical Director, no other employee under her supervision received more than five notices or warnings, or more than one suspension, during the course of his or her employment. (Pisano Decl. ¶ 6.)

In addition, the plaintiff received a number of written reprimands, written counseling, and suspensions prescribed by the Hospital's progressive discipline policy for workplace shortcomings or violations. (Pisano Decl., Ex. 4.) It appears undisputed that prior to 2011, the plaintiff was actually subjected to a more lenient standard than her co-workers, but nevertheless still received a number of written reprimands or counseling, for infractions such as administering medication without

a doctor's approval; failing to document interactions with patients; and once for causing a patient to receive an excess dosage of medication. (Def. SUMF ¶¶ 24-32.) In August 2010, the plaintiff was suspended for three days after it was discovered that she failed to notify a physician regarding a change in a patient's status, and to document that change. This was considered a "Group II" violation, resulting in suspension, and the issuance of an Improvement Action Plan. (Id. ¶¶ 33-36.)

In February of 2011, the plaintiff was again suspended for three days for failing to properly and safely round on a patient who was under her care, only 60 days after she had been warned about failing to safely care for patients with respect to the use of bed alarms. (Pisano Decl., Ex. 4, at WBGH 0783.) This disciplinary action also resulted in an Improvement Action Plan, which the plaintiff signed without comment. As part of this process, Ms. Pisano and the plaintiff each acknowledged that the Hospital had endeavored to be lenient with the plaintiff because of some particularly tragic circumstances that had occurred previously, including the murder of one of her sons in 2002 and the subsequent suicide of another son. (Def. SUMF ¶¶ 42-43.)

Following the plaintiff's return from this second suspension, up to January 2014, she received another six Employee Notifications for poor performance. (Pisano Decl., Ex. 2.) Thereafter, the plaintiff's workplace performance continued

5

to suffer notably, and between January and April 2014, she received additional write-ups and warnings, for failing to provide medication in a timely manner, failing to follow patient-identification protocols, and for committing two errors in administering the medication Dilaudid, a controlled substance, which constituted a Group II violation. (Pisano Decl., Ex. 2 at WBGH 0768-0749; Goble Decl. ¶ 8.) With respect to the last violation regarding the failure to document the administration of Dilaudid, the plaintiff's written reprimand expressly advised her that "If this behavior continues, it can result in suspension and/or termination of employment." (Pisano Decl., Ex. 4 at WBGH 0749.) The plaintiff acknowledged that she had violated Hospital protocol in the manner charged. (Zalenski Dep. at 221:18-222:16.)

Unfortunately, the plaintiff's workplace problems continued into April 2014, when on April 29, 2014, when she once again failed to follow Hospital protocol with respect to identifying patients, resulting in a patient receiving an incorrect identification band. (Pisano Decl., Ex. 5; Zalenski Dep. at 273:23-274:8.) The plaintiff had been warned approximately two months earlier that this very conduct could result in further discipline if repeated. (Pisano Decl., Ex. 2 at WBGH 0765.) Ms. Zalenski acknowledged that she committed the violation. (Zalenski Dep. at 273:23-274:8.) This violation, which concerns patient identification, is also

considered to be a Group II violation under the Hospital's policy. (Pisano Decl., Ex. 5; Goble Decl. ¶ 22.)

On the same day that she committed this infraction of Hospital rules, the plaintiff was also the subject of numerous patient complaints. (Pisano Decl., Ex. 5; Goble Decl. ¶ 24.) One patient reported that the plaintiff had failed to hook up an IV, which caused an alarm to sound and for the IV to run dry. (Pisano Decl. ¶ 25 and Ex. 2.) That same patient complained that the plaintiff had not been checking in on rounds, and that there was visible blood in his bathroom. (Pisano Decl. ¶¶27,-28 and Ex. 5.) Another patient complained about the amount of time it had taken for the plaintiff to respond to a call light and to distribute his medication. (Pisano Decl. ¶ 30 and Ex. 5.)

As part of the investigation that followed the discovery of these violations and complaints, the Hospital discovered that the plaintiff had failed to document any patient interaction for her entire shift on the Hour Rounding Logs that LPNs maintained. (Pisano Decl. ¶¶30-31 and Ex. 5.) This conduct is related to that for which the plaintiff had previously been warned, including failing to answer alarms and document patient interactions. (Pisano Decl., Exs. 3, 5; Zalenski Dep. at 276:16-277:3.)

The complaints were brought to Ms. Pisano's attention, who in turn went to Human Resources to discuss them. (Pisano Decl. ¶ 33; Doc. 26, Ex. G,

Declaration of Susan Chandler ("Chandler Decl.") at ¶ 4; Goble Decl. ¶ 11.) Ms. Pisano and Ms. Goble discussed the plaintiff's performance in the context of a work history that indicated significant concerns about the quality of care that the plaintiff was administering to patients. (Pisano Decl. ¶33; Goble Decl. ¶ 11.) Following this meeting, Ms. Goble directed that Ms. Pisano meet with the plaintiff and Susan Chandler, the Hospital's Employee Relations Specialist, to address the performance issues. (Chandler Decl. ¶ 3; Goble Decl. ¶ 18.)

According to Hospital protocol, after an investigation is undertaken, an employee will be suspended pending a final review and decision rendered by Ms. Goble. (Goble Decl. ¶ 19.) According to Ms. Goble, if the plaintiff was unable to explain her behavior on April 29, 2014, then an extensive history of workplace violations, her March 2014 write-up, and her persistent failure to adhere to the Hospital's patient identification would combine to form a Group II violation. Similarly, if it was determined that the plaintiff had permitted visible blood to remain in a patient's room, together with other complaints of poor performance, would also constitute either a Group II or Group III violation, either of which could result in termination. (Goble Decl. ¶ 20.)

On May 1, 2014, Ms. Pisano, Ms. Chandler, and Ms. Zalenski met to discuss the reported violations of Hospital policies and protocols. (Pisano Decl. ¶35 and Ex. 6; Chandler Decl. ¶ 14.) At that time, the plaintiff acknowledged that she

failed to put an identifying bracelet on a patient.[3]  (Zalenski Dep. at 235:23-236:5; Pisano Decl. ¶ 37; Chandler Decl. ¶ 15.)   The plaintiff was informed that she would be suspended following further review, and that after Ms. Goble's review she could be terminated.  (Zalenski Dep. at 235:6-17; Chandler Decl. ¶16; Pisano Decl. ¶ 36.)

When she was informed that she was being suspended pending Ms. Goble's review, and that she could be terminated, the plaintiff reacted in an alarming manner, telling Ms. Pisano and Ms. Chandler that she could "take a bottle of pills." (Zalenski Dep. at 19:3-4; 233:14-15; 235:15-19.)   Both Ms. Pisano and Ms. Chandler interpreted this statement to mean that Ms. Zalenski was threatening suicidal behavior, and Ms. Chandler suggested that she speak with a Crisis Counselor in the Hospital's Emergency Department.  (Pisano Decl. ¶40; Chandler Decl. ¶¶19-20.)  When the plaintiff refused this suggestion, Ms. Chandler asked for a Crisis Counselor to come to Human Resources to meet with her.  (Pisano Decl. ¶ 41; Chandler Decl. ¶ 21.)

After the meeting, Ms. Chandler spoke with Ms. Goble and the appropriate degree of discipline to be imposed in light of the plaintiff's admissions regarding

---

[3]   In her opposition papers, the plaintiff seems to argue that she does not admit to knowing that there was blood on the floor of a patient's room, but in her deposition she said that the basis for the investigation is that "I put the bracelet on the patient wrong and there and there was blood on the floor and housekeeping never cleaned it up."  (Zalenski Dep. at 234:23-236:5.)

the misconduct. (Goble Decl. ¶ 21; Chandler Decl. ¶ 24.) In considering the circumstances, Ms. Goble determined that the failure to follow Hospital protocol regarding patient identification was a Group II violation, and that the cumulative patient complaints and failure to identify blood in the patient's room rose to the level of a Group III violation. (Goble Decl. ¶ 22.) Ms. Goble, in consultation with Ms. Pisano and Ms. Chandler, believed that the plaintiff's progressively deteriorating performance in the first few months of 2014 presented a risk to patient safety, and she decided to terminate the plaintiff's employment upon her return to work on May 8, 2014. (Goble Decl. ¶¶3, 23; Pisano Decl., Ex. 5.) According to Ms. Goble, the Hospital did not consider the plaintiff's leave from May 2-7, nor did it consider any medical or psychiatric bases for the leave, in making its termination decision. (Goble Decl. 26.)

During the last ten years of the plaintiff's employment with the Hospital, she availed herself of intermittent leave under the Family and Medical Leave Act, and the Hospital never denied any of her request to take leave. (Zalenski Dep. at 120:2-16; 282:10-14.) The plaintiff also testified that she does not believe she had ever been retaliated against for requesting or using FMLA leave. (Id. at 282:16-18.) The plaintiff does not believe she was discriminated against with regard to any leaves of absence she may have taken at any time during her employment. (Def. SUMF ¶ 102; Zalenski Dep. at 121:22-122:1.)

In February 2014, the plaintiff provided her employer with a note from her doctor which provided that "due to excess weight with bariatric patient [the plaintiff] is unable to care for bariatric patients only." (Pisano Decl ¶ 8 and Ex. 1; Zalenski Dep. at 277:23-279:13.) Upon receipt of the note, the Hospital stopped assigning the plaintiff bariatric patients. (Zalenski Dep. at 105:18-23 and 279:14-17; Pisano Decl. ¶10.)

Thereafter, in March 2014, the plaintiff began coming to work wearing a wrist brace. (Zalenski Dep. at 60:2-8.) The plaintiff cannot recall whether she submitted a note from her doctor regarding the need for this brace, but claims that she experienced problems performing her duties at work when she was not wearing it. (Zalenski Dep. at 280:13-16 and 63:17-64:21.) The plaintiff wore the brace for approximately two months. (Zalenski Dep. at 65:20-23.) At one point, when the plaintiff worked a shift on a unit other than 6 East, the supervisor on that unit, Judy Ragukas, notified Ms. Pisano that the wrist brace presented an infection control risk. (Pisano Decl. ¶13.) This prompted Ms. Pisano to follow up with the Hospital's Infection Control Officer, who confirmed that employees were not permitted to wear braces, casts, or splints on their hands when they came into direct contact with patients. (Id. ¶14.) Accordingly, Ms. Pisano advised the plaintiff that she would not be permitted to wear the brace during patient

interactions due to the infection risk. (Pisano Decl. ¶ 15; Zalenski Dep. at 113:7-14.)

The plaintiff conceded that Ms. Ragukas never said or did anything that she considered to be discriminatory. (Zalenski Dep. at 108:2-12.) She also agrees that she was not issued any discipline as a result of her inability to perform certain functions because of her wrist injury. (Zalenski Dep. at 282:19-283:2.) Nevertheless, the plaintiff in this action has asserted that she believes the Hospital terminated her employment because she asked to wear the brace; her basis for this assertion appears to rest on the fact that "they made me take it off." (Id.) However, after being told that the brace violated Hospital policy because it posed an infection risk, the plaintiff never complained to any manager, human resources representative or occupational health representative about her alleged continued desire to wear the brace, and there appears to be no evidence that the plaintiff ever discussed with the Hospital any other accommodation for her wrist injury aside from being exempted from caring for bariatric patients. (Zalenski Dep. at 114:1-10.) Ms. Goble has flatly attested that when she made the decision to terminate the plaintiff's employment, she was unaware of any wrist condition or diagnosis, and was unaware of any specific limitations that were associated with the plaintiff's wrist. (Goble Decl. ¶ 28.)

In addition to her wrist injury, the plaintiff discussed with Ms. Pisano her belief that she would require neck surgery sometime in 2014. The record is not clear when this conversation took place. Ms. Pisano has attested that she never discussed the plaintiff's potential surgery with anyone else at the Hospital, and at no time did the plaintiff put in a request for FMLA leave to have the surgery. (Pisano Decl. ¶ 20; Goble Decl. ¶ 29.) Indeed, the plaintiff never submitted any medical information to the Hospital regarding any planned surgery in 2014. (Goble Decl. ¶ 30 and Doc. 26, Ex. D.)

Nevertheless, the plaintiff speculates that the Hospital terminated her employment because she was going to need an extensive period of leave to convalesce from neck and wrist surgeries. (Zalenski Dep. at 61:16-21; 75:2-6; 104:8-17; 284:2-16) ("I also believe that they knew that I was going to have spine surgery and hand surgery, so they knew I would be off for almost eight months."). The plaintiff also offers that she believed the Hospital terminated her employment because she was a highly-paid employee, though she has no evidence for this assertion other than her own belief. (Zalenski Dep. at 284:11-15.) Neither Ms. Goble nor Ms. Chandler knew that the plaintiff would need neck surgery in 2014. (Goble Decl. ¶ 27; Chandler Decl. ¶ 30.)

## III.  STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  For purposes of Rule 56, a fact is material if proof of its existence of nonexistence might affect the outcome of the suit under the applicable substantive law.  *Haybarger v. Laurence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Id.* (quoting *Anderson*, 477 U.S. at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party must show that if the evidence of record were reduced to admissible evidence in court, it would be insufficient to allow the non-moving party to carry its burden of proof.  *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  Provided the moving party has satisfied this burden, "its opponent must do more than simply show that

there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings. *See Martin v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007); *see also* Fed. R. Civ. P. 56 (c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, *Anderson*, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. *Id.* Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Id.* at 252; *see also Big Apple BMW*, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the

15

> court cannot credit the movant's version of events against
> the opponent, even if the quantity of the movant's
> evidence far outweighs that of its opponent. It thus
> remains the province of the factfinder to ascertain the
> believability and weight of the evidence.

*Id.* In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted); *NAACP v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011).

## IV.   **DISCUSSION**

The plaintiff has brought an assortment of claims alleging discrimination and retaliation in violation of the FMLA, the ADA, and the parallel provisions of the Pennsylvania Human Relations Act. It appears that the plaintiff is claiming that the Hospital terminated her employment unlawfully because she believed that she was going to need neck and wrist surgery along with an extended period of recovery, because she wore a wrist brace, and because she was a highly compensated employee. She also alleged somewhat vaguely that she had been discriminated against on the basis of her mental health conditions, including depression, although it does not appear that this allegation in the amended complaint was supported through discovery. With respect to her asserted need for accommodation, the plaintiff contends that the Hospital's requirement that she

remove her wrist brace during patient encounters was discriminatory, and a refusal of a reasonable accommodation, despite the undisputed fact that the Hospital deemed braces, casts, and splints to pose an unacceptable risk of patient infection and, therefore, restricted their use on employee hands and wrists.

The Hospital flatly disputes all of these allegations of discrimination and retaliation, and in support of its motion for summary judgment points to evidence showing that Ms. Zalenski had for more than a decade had her FMLA requests honored at all times, and without issue. The Hospital also notes – and the plaintiff has agreed – that the plaintiff received singularly lenient treatment and consideration during her employment, owing in large part to the tragic circumstances that occurred in the plaintiff's personal life during her employment. The Hospital maintains that when it terminated the plaintiff's employment for a series of violations she committed on April 29, 2014, its decision was based on the fact that the plaintiff had again committed serious violations of hospital policy and protocol by failing to adhere to patient identification practices and a growing concern that the patient's repeated violations presented an unacceptable level of risk to patients. The Hospital also relies heavily on the declarations of its own employees and the deposition testimony of Ms. Zalenski to show that there is no actual evidence to support the plaintiff's assertions that the decision to terminate her employment was retaliatory or discriminatory, and that the plaintiff's assertions

to the contrary are supported only by her own beliefs and speculation, and not on any substantive evidence.

We consider the plaintiff's claims, and the defendant's arguments regarding each of them, below.

### A. Plaintiff's FMLA Interference Claim is Properly Construed as a Claim Alleging Discrimination or Retaliation Under the FMLA

At the outset, in Count III of the amended complaint, the plaintiff avers that the Hospital interfered with her right to avail herself of her rights under the FMLA by terminating her employment. The Hospital correctly argues that this claim is, as a legal matter, not one for interference under the FMLA, but for retaliation.

The FMLA provide for two theories of recovery: for interference with FMLA rights pursuant to 29 U.S.C. § 2615(a)(1), and for retaliation or discrimination pursuant to 29 U.S.C. § 2615(a)(2). With respect to interference claims, the Act provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act. 29 U.S.C. § 2615(a)(1). In order to assert an interference claim, "an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." *Sarnowski v. Air Brroke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007). The Third Circuit Court of Appeals has explained that interference claims are grounded

in the contention that an employer denied a plaintiff substantive rights protected under the FMLA, whereas discrimination and retaliation claims stem from adverse employment action taken because of the plaintiff's invocation of FMLA rights. *O'Donnell v. Passport Health Communications, Inc.*, No. 13-2607, 2017 U.S. App. LEXIS 5793, at *9 (3d Cir. Mar. 28, 2014).

The plaintiff's claims are grounded in her assertion that her rights under the FMLA were violated through the Hospital's decision to terminate her employment. She makes no claim or showing that her FMLA rights were ever interfered with during her employment, and she has attested that she was never denied FMLA rights during her employment. The plaintiff's conflation of the FMLA's theories of liability is made clear in paragraph 34 of the amended complaint where she alleges that her termination was "in retaliation for and constituted interference with her exercise of rights under the FMLA." (Am. Compl. ¶ 34.) The plaintiff's FMLA claims are, at bottom, grounded in the fact of her termination, not with any alleged interference with her exercise of FMLA rights during her employment.

In cases such as this, where the claims of FMLA liability are predicated on the event of termination, the plaintiff's claims are construed as being brought under 29 U.S.C. § 2615(a)(2) for retaliation. *Stephenson v. JLG Indus.*, No. 09-1643, 2011 U.S. Dist. LEXIS 34564, at *19 (M.D. Pa. Mar. 31, 2011) ("courts have consistently treated claims of interference as a result of termination as retaliation

claims"); *see also Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 146-48 (3d Cir. 2004); *Mascioli v. Arby's Rest. Grp., Inc.*, 610 F. Supp. 2d 419, 430-31 (W.D. Pa. 2009) (FMLA interference claim based upon employer's termination of employee in anticipation of future leave is an FMLA retaliation claim); *Lynch v. Matthews Int'l*, 2010 U.S. Dist. LEXIS 64261, 2010 WL 2640597, at *6, n.6 (W.D. Pa. June 29, 2010) (same).

In this case, the plaintiff has purported to bring claims for both FMLA retaliation and interference, but has grounded both theories of liability in the Hospital's act of terminating her employment. Because this theory of liability sounds as a retaliation claim under the FMLA, and not as an interference claim, it is recommended that the Court restrict its consideration of the plaintiff's FMLA claim to 29 U.S.C. § 2615(a)(2) as a retaliation claim.

## B. Plaintiff's FMLA and ADA Retaliation Claims Fail on the Merits

In Counts II and III of the amended complaint, the plaintiff contends that she was discriminated or retaliated against for engaging in conduct protected under the Acts when she was terminated in May 2014. The plaintiff asserts that she was terminated because she intended to take future FMLA leave for surgeries that would require extensive periods of convalescence, and because she wished to wear a wrist brace at work in contravention of the Hospital's protocols to prevent the risk of infection to its patients. Review of the record reveals little support for these

assertions, which seem to be based exclusively on the plaintiff's subjective belief, and are substantially belied by a record which shows that the decisionmaker who decided to terminate the plaintiff's employment was unaware of the plaintiff's medical plans and limitations, and had a substantial basis justifying the adverse employment decision. Furthermore, the plaintiff has offered no evidence that could permit a factfinder to conclude that the Hospital's legitimate reasons for its employment decision were pretextual cover for unlawful discrimination or retaliation.

To prove a claim for FMLA retaliation, an employee "must show that his employer intentionally discriminated against him for exercising an FMLA right." *Mascioli*, 610 F. Supp. 2d at 433 (quoting *Martin v. Brevard County Sch.*, 543 F.3d 1261, 1267 (11th Cir. 2008)). The plaintiff's retaliation claims are analyzed under the familiar burden-shifting paradigm prescribed by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Naber v. Dover Healthcare Assocs.*, 765 F. Supp. 2d 622, 633 (D. Del. 2011); *Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004); *Baltuskonis v. U.S. Airways, Inc.*, 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999). To establish a *prima facie* case of FMLA retaliation, the plaintiff must show: (1) plaintiff availed herself of a protected right under the FMLA; (2) plaintiff suffered an adverse employment action; and (3) there was a causal connection between the plaintiff's protected activity and the employer's

adverse employment action. *Bearley*, 322 F. Supp. 2d at 571. If a plaintiff can establish a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Id.* If the employer does so, the burden returns to the plaintiff to present evidence to show that the defendant's proffered legitimate reasons were not its true reasons, but were instead merely pretext for its unlawful actions. To carry this burden, the plaintiff must either discredit the defendant's proffered reasons or otherwise adduce evidence showing that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. *Id.*; *see also Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). A substantially identical burden-shifting standard applies with respect to claims of ADA retaliation. *See generally Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

The Hospital disputes that Ms. Zalenski has come forward with any evidence to carry her burden of demonstrating that she engaged in protected activity and further disputes that there is sufficient evidence to show a causal relationship between any alleged protected activity and the Hospital's decision to terminate. We agree that the evidence on both of these points is lacking, and entirely inadequate to create a triable issue of retaliation under the FMLA or ADA.

Having reviewed the record, we find no evidence to show that the plaintiff engaged in any protected activity under the FMLA. There is no evidence to show

22

that the plaintiff ever requested to take FMLA leave in 2014, and instead she seems to predicate this claim entirely on her assertion that she told Ms. Pisano that at some point in 2014 she would need neck surgery. Other than suggesting that she might, at some time, need to have a medical procedure, the record is barren of any evidence that that plaintiff even hinted at requiring time away from work that might be protected under the Act. The plaintiff acknowledged in her deposition that she had, for years, availed herself of her rights under the FMLA, and confirmed that she was never disparaged for doing so, and agreed that she had never experienced any retaliation as a result. Thus, her entire FMLA claim seems to turn on whether her vaguely suggesting to Ms. Pisano that she would, at some unspecified time, have surgery to correct a medical issue affecting her neck, constitutes activity that is protected under the FMLA. This is inadequate to qualify as protected activity, and is too vague to be construed as notice to the Hospital of an intent to use FMLA leave.

As a rule, an employee must provide notice to the employer in order to be entitled to FMLA benefits. *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007). An employee seeking to take leave to address a serious health condition "shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave under such subparagraph, except that if the date of the treatment requires leave to

begin in less than 30 days, the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(2)(B). An employee may satisfy the requirements of providing notice by "simple verbal notification," *Mascioli*, 610 F. Supp. 2d at 435, and the Third Circuit has emphasized that she "need not use any magic words." *Sarnowski*, 510 F.3d at 402. Instead, "[t]he critical question is how the information conveyed to the employer is reasonably interpreted." *Id*. In *Sarnowski*, the Third Circuit found that when considering the fact that the employee had communicated a medical condition to his employer, and indicated that there may be a need for surgery, this was evidence sufficient to meet the first element of a retaliation claim. The district in *Mascioli* similarly found that the communication of a medical condition to the employer, coupled with an indication that future time off may be necessary as a result, was sufficient to meet the first prong of the burden-shifting test. *Mascioli*, 610 F. Supp. 2d at 435.

Mindful of the leniency articulated in *Sarnowski* and *Mascioli*, we nevertheless believe that a paucity of evidence in the record to show that the plaintiff sufficiently communicated to the Hospital regarding the condition she was experiencing, as the evidence shows no more than that she vaguely indicated to Ms. Pisano that she might need to have surgery on her neck. There does not appear to be evidence showing that the plaintiff made any statement about needing an extended period of leave, but simply that she might at some point be having

surgery.  Unlike in her past use of FMLA rights while employed at the Hospital, the plaintiff did not request leave, and at no time provided medical information to the Hospital regarding any upcoming surgery in 2014.  The extremely limited evidence regarding the offhand mention of potential surgery in this record is insufficient to constitute protected activity.  However, as will be discussed below, even if this information could reasonably be considered protected under the FMLA, the plaintiff fails to make out a *prima facie* case, and she does not adequately respond to the Hospital's given reasons for terminating her.

With respect to her ADA claim, which is more in the nature of a failure-to-accommodate claim than one for retaliation, plaintiff's only protected activity appears to have been providing the Hospital with a doctor's note that restricted her from working with bariatric patients because of her wrist injury.[4]  There is no

---

[4]  In her brief, the plaintiff asserts that her discharge violated the ADA because it was allegedly "motivated by plaintiff's perceived mental condition, plaintiff's need for neck surgery or a combination of the two." (Pl. Br., p. 6.)  She also offers that she believes the Hospital failed to accommodate her need for a wrist brace because it did not engage in an interactive process with her to determine what accommodations may be necessary. (*Id.* at pp. 8-11.)  This latter claim is particularly weak, since there is no evidence to show that the plaintiff objected when told that hospital policy required that the brace be removed when working with patients, and there appears to have been no request on her part for any kind of accommodation.  The plaintiff seems to be suggesting that the Hospital should have divined that she required some other accommodation, but this is difficult to square with the evidence, which shows that the plaintiff removed the brace, resumed her work, and did not complain about the decision or seek some other accommodation for an unspecified injury – aside from the accommodation that was actually sought to be relieved from caring for bariatric patients.

dispute that this request was accommodated, and the plaintiff was relieved from working with bariatric patients immediately. There is nothing to suggest that the plaintiff's use of a wrist brace, for which no medical note or documentation was provided, constituted protected activity, and we fail to understand this aspect of the plaintiff's claim. The evidence shows only that the plaintiff began wearing a wrist brace while at work, and that a unit supervisor became concerned about its use in light of Hospital policy regarding the risks that such medical devices presented with respect to infection. Thereafter, the plaintiff was told she had to stop wearing the brace, which she apparently did without complaint, and without further medical guidance provided by her physician. There is nothing in the record that would support the plaintiff's contention that the issues surrounding her use of the wrist brace, and the requirement that she discontinue wearing it, implicated protected activity under the ADA.

We further agree with the defendant that there is insufficient evidence to show a causal link between the plaintiff's alleged protected activity under the FMLA or the ADA and the Hospital's decision to terminate her employment. The Third Circuit has instructed that the two primary factors that are relevant to show a causal link for a retaliation claim are timing and evidence of ongoing antagonism. *Mascioli*, 610 F. Supp. 2d at 436 (citing *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001)). Whether a causal link exists between the

exercise of protected activity and adverse employment action "must be considered with a careful eye to the specific facts and circumstances encountered." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014).

In this case, the plaintiff has failed to come forward with sufficient evidence to demonstrate a causal link between what she contends was protected activity and Ms. Goble's decision to terminate her employment. Aside from the vagueness regarding the allegedly protected activity, there is no evidence at all to show that the actual decisionmaker was aware that the plaintiff had engaged in any protected activity, or that she had impending surgeries, or that she would need to take time off of work, or that she wished to wear a brace on her wrist. Ms. Goble, who made the decision to terminate, had no knowledge of the plaintiff's potential spine surgery, as the only person the plaintiff told about this possibility was Ms. Pisano. The plaintiff speculates that Ms. Goble might have known about this or other matters, but there is no evidence to that effect, and indeed the evidence shows otherwise.

Regardless of any possible temporal proximity between the plaintiff allegedly telling Ms. Pisano that she might need to have surgery, or the issues regarding her wrist, and the eventual termination in May 2014, the total absence of evidence to show that Ms. Goble was even aware of these matters leaves the record barren of evidence to show a causal link. *See Olson v. GE Astrospace*, 101 F.3d

947, 954 (3d Cir. 1996) (where there was no evidence other than "sheer speculation" that the final decisionmaker knew about the plaintiff's condition, there is an absence of evidence to show causation); *see also Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002) ("to establish discrimination because of a disability, an employer must know of the disability.").

Assuming that the plaintiff had sufficiently shown protected activity and a causal link between that activity and her firing – both of which we submit have inadequate evidentiary support – the Hospital has nevertheless amply demonstrated a legitimate reason for ending her employment. It is undisputed that the plaintiff had a work history that was marked by dozens of infractions, violations, write-ups, counseling, and even suspensions, many of which related directly to concerns over the plaintiff's violations of patient safety and identification protocols. It is further undisputed that on April 29, 2014, the plaintiff committed a series of infractions and was the subject of multiple patient complaints which merited investigation, and which were found to constitute serious violations of Hospital policy. The plaintiff does not really even attempt to dispute the evidence on this score. Instead, the plaintiff suggests that it is sufficient that she believes that the decision was trumped up or fabricated is sufficient to meet her burden of coming forward with actual evidence that could allow a factfinder to disbelieve the given reasons, which are themselves substantially documented. Simply arguing that the given reasons

are untrue is not sufficient to show pretext. *Fuentes*, 32 F.3d at 766; *see also Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (plaintiff must "present evidence contradicting the core facts put forward by [the Hospital] as the legitimate reason[s] for its decision."). In this case, the plaintiff not only conceded the conduct that she engaged in the conduct which provided the basis for eventual termination, but she has presented no evidence to throw the given reason for her firing into dispute. She has not, for example, shown that other employees were treated more favorably after engaging in similar workplace misconduct, or proffered other evidence that might show bias or other invidious reason for the decision made.

At most the plaintiff seems to argue that her threat to consume a bottle of pills after learning that she may be terminated is somehow probative of pretext, or to demonstrate that the reason for her firing was discriminatory or based on the Hospital's concerns over her mental health. Yet, the evidence shows that at the time she made this statement, she had already been told that she may be fired for the conduct which was being investigated. The fact that the plaintiff subsequently threatened to harm herself does not cast doubt on the legitimacy of the Hospital's reasons for terminating her employment on the basis of multiple violations, and a history of similar conduct, which potentially threatened patient safety.

For all of the foregoing reasons, it is recommended that the court find that the plaintiff has not established a *prima facie* case of retaliation under the FMLA or ADA, and that the defendant has demonstrated without dispute legitimate reasons for the adverse employment decision. Summary judgment on these claims in Counts II and III of the amended complaint is appropriate.

## C.     Plaintiffs' ADA Accommodation Claim Fails on the Merits

The plaintiff has also claimed in Counts I and IV that the Hospital violated the ADA and PHRA by failing to accommodate her alleged need to wear a wrist brace. The plaintiff makes this argument despite the fact that the Hospital admittedly did accommodate the only request she actually made, with the support of her doctor, to be relieved of caring for bariatric patients because of the strain it put on her wrist.

In order to establish a failure-to-accommodate claim, the plaintiff must prove that she had a disability within the meaning of the ADA, that she was otherwise qualified to perform the essential functions of her job, and that the employer knew that she needed reasonable accommodation and failed to provide it. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761, 768 (3d Cir. 2004). When accommodations are in issue, the Third Circuit has explained that "the burden is on the employee or a representative to inform the employer of both the disability and desire for an accommodation." *Drozdowski v. Northland Lincoln*

*Mercury*, 321 F. App'x 181, 185 (3d Cir. 2009); *see also Sever v. Henderson*, 381 F. Supp. 2d 405, 419-20 (M.D. Pa. 2005) (granting summary judgment in favor of employer where plaintiff "failed to produce any evidence that the employer had knowledge of any limitations").

In this case, the plaintiff did request an accommodation for her wrist condition when she presented a note from her doctor advising her employer that she needed to be relieved from caring for bariatric patients. That is the extent of the requested accommodation, and there is no dispute that the Hospital immediately acceded to that request, and that the plaintiff experienced no adverse consequences as a result.

The plaintiff does not base her claim on that accommodation, but instead argues that the Hospital somehow failed to accommodate her need for accommodation when it informed her that she needed to discontinue wearing a wrist brace that she began wearing in March 2014 since it constituted an infection risk. The evidence reveals that the plaintiff did not protest this decision or otherwise inform her supervisors that the wrist brace was medically necessary. There is no evidence to show that she requested that she be accommodated either by being allowed to use the wrist brace, or through some alternative means. There simply is no evidence that reasonably could support a finding that the Hospital should have known that the plaintiff required any accommodation other than the

one actually requested, and the fact that she said nothing after being told that Hospital policy required the brace's removal is hardly sufficient to have put the Hospital on notice that it needed to engage in an interactive process to discern what accommodation might be possible, or whether one was even needed. *See Conneen v. MBNA Bank, N.A.*, 334 F.3d 318, 331 (3d Cir. 2003); *Bair v. Citizens Bank of Pa.*, No. 4:13-CV-2866, 2015 U.S. Dist. LEXIS 148888, at *40-41 (M.D. Pa. Sept. 21, 2015).

Simply stated, there is insufficient evidence to support the plaintiff's claim that the Hospital violated the ADA by failing to accommodate the plaintiff's unstated needs regarding a wrist condition, which had previously been accommodated by immediate compliance with the instructions provided by a doctor, particularly where the plaintiff never raised an issue regarding what it was that she needed, and never said anything regarding her need to wear a wrist brace after she removed it and resumed her work without issue.

## V.   <u>RECOMMENDATION</u>

Accordingly, for the foregoing reasons, it is RECOMMENDED that the Hospital's motion for summary judgment be GRANTED as to all claims in this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*/s/  Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge


Dated:       August 21, 2017